IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE DIAMOND CENTER, INC.,

                      Plaintiff,

     v.

LESLIE'S JEWELRY MFG. CORP.,

                      Defendant.

OPINION AND ORDER

07-cv-708-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action for monetary relief, plaintiff The Diamond Center, Inc. asserts six causes of action against defendant Leslie's Jewelry Mfg. Corp. The six causes of action are (1) secondary-line price discrimination under Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a); (2) breach of contract and breach of warranty under the Uniform Commercial Code, Wis. Stat. §§ 402.601-616; (3) breach of implied duty of good faith under the Uniform Commercial Code, Wis. Stat. § 402.203 and Wisconsin common law; (4) tortious interference with contract; (5) unjust enrichment; and (6) promissory estoppel. Jurisdiction is present. 28 U.S.C. §§ 1331 and 1332(a).

Presently before the court is defendant's motion to dismiss plaintiff's first, fourth, fifth and sixth causes of action for failure to state a claim under Federal Rule of Civil

1

Procedure 12(b)(6). I conclude that plaintiff's first and fourth causes of action fail to state a claim upon which relief may be granted and they will be dismissed. However, defendant's motion will be denied with respect to plaintiff's fifth and sixth causes of action.

For the purpose of deciding a motion to dismiss, the court accepts as true all of the well-pleaded allegations of the complaint. I find that the following facts are fairly alleged in the complaint and attached exhibits.

## ALLEGATIONS OF FACT

### A. Parties and Diversity

Plaintiff The Diamond Center, Inc. is a privately owned corporation and jewelry retailer that is incorporated and maintains its principal place of business in Wisconsin. Defendant Leslie's Jewelry Mfg. Corp. is a privately owned corporation and gold wholesaler incorporated in New York. Its principal place of business is in Connecticut. Plaintiff initiated this legal action in December 2007 asserting six causes of action and seeking damages from defendant in excess of $1,175,000.00.

### B. Diamond Center's Relationship with Leslie's Jewelry

Plaintiff has operated in Wisconsin from 1984 to the present. Plaintiff has stores in both Janesville and Madison, Wisconsin, at which it sells a wide range of fine and fashion

2

jewelry, including gold, silver and platinum jewelry, gems and watches. From 1988 to September 2007, plaintiff purchased almost all of its gold jewelry for resale from defendant under a written contract that provided both a Lifetime Guarantee and a Stock Balance program.

> Defendant's Lifetime Guarantee consists of the following terms:
>
> If It Breaks For Any Reason, We'll Replace It. . . . . Period!!  That's our Lifetime Guarantee*
>
> Now more than ever **Leslie's** stands by each item of gold we sell. Should your customer return a piece that is damaged, be it chain, bracelet, choker, earring, bangle, or charm, there is no need to repair it. Simply send it back to us and our new **Rapid Replacement System**™ will insure you get a new one fast.**
>
> * As with any service there are certain conditions:
>   -no alterations or engraving
>   -customer's account balance must be current
>   -account must have shown activity within the last 9 months
> ** At times there may be a 5% weight variation beyond our control. Discontinued items may be exchanged for current styles.

Defendant's Stock Balance program consists of the following terms:

> Our gram for gram **STOCK BALANCE** program guarantees that your inventory will remain fresh and up-to-date, making your selling experience a positive one. Please note that all exchanges must be accompanied by an order of equal or greater value and have a positive dollar balance.*** Also, note that returns during the months of November, December and January may be delayed because of the holiday season.
>
> *** Returns accompanied by orders of lesser value than the item(s) being sent back, cannot be applied. The item(s) will remain on account in the form of grams.

Defendant also provides a Lifetime Guarantee to customers who purchase defendant's

3

jewelry from a jewelry retailer like plaintiff, which consists of the following terms:

> Congratulations! You have just purchased a piece of LESLIE'S gold jewelry, which is guaranteed to be free of defects in materials and workmanship. If your LESLIE'S gold jewelry, for whatever reason, should become broken, damaged or defective, simply return it to your LESLIE'S jeweler for a prompt replacement with a new piece.
>
> All LESLIE'S jewelry that is returned must have an authentic LESLIE'S trademark. The terms and conditions are established by your local jeweler at the point of sale. In the event that a product is no longer available LESLIE'S reserves the right to substitute a product of similar design and quality to your authorized jeweler.

Defendant offers its Lifetime Guarantee, Stock Balance program and customer Lifetime Guarantee to all retailers that purchase gold from defendant.

A retailer is required to pay a premium price for defendant's gold products to obtain defendant's Lifetime Guarantee and Stock Balance program. Retailers who purchase gold products from defendant are permitted to refer to defendant's Lifetime Guarantee and Stock Balance program in their advertising and marketing. Plaintiff purchased gold products from defendant at a premium price in order to obtain defendant's Lifetime Guarantee and Stock Balance program. The premium price on defendant's gold products was 30% greater than the price of comparable gold products sold by other gold wholesalers without any lifetime guarantee or stock balance program. If plaintiff had purchased its gold products elsewhere without a lifetime guarantee or stock balance program, plaintiff would have spent an estimated $2 million as opposed to the estimated $3 million it spent since 1988 in purchasing gold products from defendant.

Plaintiff paid for and used defendant's Lifetime Guarantee and Stock Balance program as a way to insure high quality customer service. Plaintiff advertised and marketed its gold products as covered by defendant's Lifetime Guarantee. At one time, plaintiff began providing a Leslie's Lifetime Guarantee card to any customer who purchased a Leslie's gold product. Under defendant's Lifetime Guarantee, plaintiff would replace a customer's defective or damaged Leslie's jewelry with a Leslie's product of similar value from plaintiff's showcase.

Approximately once a week from 1988 to September 2007, plaintiff ordered and received from defendant large volumes of gold products that were covered under defendant's Lifetime Guarantee and Stock Balance program. During the same time period, plaintiff regularly returned defective, damaged or discontinued gold products in bulk to defendant for replacement. Defendant would replace the returned items with similar gold products or current gold products that were similar in value as measured by price per gram.

C.  <u>Termination of Relationship Between Diamond Center and Leslie's Jewelry</u>

On September 5, 2007, defendant's president and owner, Andrew Ban, wrote to plaintiff's president and owner, Steven Yeko, Sr., "revoking" plaintiff's use of the Stock Balance program. Ban stated that defendant would no longer accept returns from plaintiff under the Stock Balance program unless the return was accompanied by an order for gold

5

products with a value at least four times greater than the gold value of the returned products on the date of the shipment. The letter stated that any of plaintiff's returns that were not accompanied by such an order would not be processed.

On October 18, 2007, plaintiff's attorney notified defendant in writing that plaintiff objected to the alterations to the terms of the Lifetime Guarantee and Stock Balance program. Defendant refused to remove the altered terms or to accept any returns that did not satisfy the new terms. Defendant has not attempted to modify, alter or revoke the terms of its Lifetime Guarantee or Stock Balance program with any other jewelry retailers. Plaintiff refused to purchase any more gold product from defendant under defendant's altered terms. Instead, plaintiff began purchasing gold products from wholesalers who do not offer a lifetime guarantee or a stock balance program.

Defendant remains in possession of 20 gold products, valued at $5,000.00, that were exchanged by customers through plaintiff. Defendant remains in possession of gold returns, valued at $20,000.00, that were purchased by plaintiff and returned to defendant for replacement. Defendant refuses to pay plaintiff for the returns. Plaintiff remains in possession of unsaleable gold products from defendant with the value of $150,000.00. Defendant's alteration of the terms of its agreement with plaintiff has caused plaintiff to lose the investment of approximately $1 million that it gained by purchasing gold products at a premium price in return for defendant's Lifetime Guarantee and Stock Balance program.

Plaintiff is now at a disadvantage as a retail jeweler because it can no longer sell defendant's jewelry with a Lifetime Guarantee, while other retail jewelers maintain the ability to do so.

Plaintiff's sales of gold products and associated profits will continue to diminish because customers will purchase defendant's gold products at other retail jewelers that sell defendant's gold products with a Lifetime Guarantee and Stock Balance program.  If plaintiff were to accept defendant's altered terms, which require plaintiff to order gold products with a value four times greater than returned items, plaintiff would not be able to compete with other jewelry retailers who can return gold products with orders of equal or greater value because the cost to plaintiff in obtaining the Lifetime Guarantee and Stock Balance program under the altered terms would raise the price of defendant's products to an "prohibitive" level.

OPINION

A.  Rule 12(b)(6) Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief can be granted. General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997).  Dismissal is appropriate  when plaintiff's complaint fails to provide enough factual allegations to "raise a right to relief above the speculative level."  Bell Atlantic Corp. v.

7

Twombly, 127 S. Ct. 1955, 1965 (2007); see also E.E.O.C. v. Concentra Health Services, Inc., 496 F.3d 773, 776-77 (7th Cir. 2007).  When deciding a motion to dismiss for failure to state a claim courts are generally restricted to an analysis of the complaint.  Hill v. Trustees of Indiana University, 537 F.2d 248, 251 (7th Cir. 1976) (citation omitted). Furthermore, courts will accept all well-pleaded facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.  Jackson v. E.J. Brach Corp., 176 F.3d 971, 977-78 (7th Cir. 1999) (citation omitted).

B.  Plaintiff's First Cause of Action: Violation of Section 2(a) of Robinson-Patman Act

The first issue to be determined is what plaintiff must allege to state a claim under Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a).  In pertinent part Section 2(a) states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . .

15 U.S.C. § 13(a).  Plaintiff specifically alleges a claim for "secondary-line price discrimination," as opposed to "primary-line price discrimination."  Primary-line price discrimination involves "conduct . . . that injures competition at the level of the discriminating seller and its direct competitors."  Volvo Trucks North America, Inc. v.

8

Reeder-Simco GMC, Inc., 546 U.S. 164, 176 (2006). Secondary-line price discrimination involves "price discrimination that injures competition among the [discriminating] seller's customers[.]" Id. Defendant argues that regardless of the type of price discrimination in question, unless two sales were made, one at a discriminatory price and another at a non-discriminatory price, no claim arises under Section 2(a) of the Robinson-Patman Act. Plaintiff disagrees and argues that there is no need for "two sales"; instead, there must be discriminatory pricing only. Plaintiff relies on Volvo Trucks but the holding of that case supports defendant's, not plaintiff's, argument.

In Volvo Trucks, the Supreme Court reasoned that a party must establish four elements to prove secondary-line price discrimination:

> (1) the relevant [product] sales were made in interstate commerce; (2) the [products] were of "like grade and quality"; (3) [the seller] "discriminate[d] in price between" [plaintiff purchaser] and another purchaser of [the products]; and (4) "the effect of such discrimination may be . . . to injure, destroy or prevent competition" to the advantage of a favored purchaser, i.e., one who "receive[d] the benefit of such discrimination."

546 U.S. at 176 (alterations to internal quotes in original) (quoting 15 U.S.C. § 13(a)). Although the language in Volvo Trucks does not explicitly require two sales, its language, as well as the language in 15 U.S.C. § 13(a), implicitly requires two sales under the requirement that the discrimination in price be between two "purchasers." One cannot be a purchaser without purchasing something at the discriminatory price. Id.; 15 U.S.C. § 13(a); see also

9

1 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation: Desk Edition §§ 5.02[1] & [3] (2d ed. 2007) ("The courts have interpreted the Section 2(a) words 'purchasers' and 'sold' to mean that Section 2(a) will not apply unless: (1) there are at least *two sales transactions*, and (2) the sales are *contemporaneous*") (emphasis in original)). Furthermore, the Supreme Court has reasoned in dicta that "no single sale can violate the Robinson-Patman Act. At least two transactions must take place in order to constitute a discrimination." Bruces' Juices, Inc. v. American Can Co., 330 U.S. 743, 755 (1947) (addressing price discrimination under Robinson-Patman Act in context of defense to collection of debt).

Moreover, in addressing Section 2(a) the Court of Appeals for the Seventh Circuit agreed with and quoted the Court of Appeals for the Third Circuit regarding the requirement that two sales occur:

> [A]t least two purchases must have taken place. The term purchaser means simply one who purchases, a buyer, a vendee. It does not mean one who seeks to purchase, a person who goes into the market-place for the purpose of purchasing. In other words, it does not mean a prospective purchaser, or one who wishes to purchase . . . .

Chicago Seating Co. v. S. Karpen & Bros., 177 F.2d 863, 867 (7th Cir. 1949) (quoting Shaw's Inc. v. Wilson-Jones Co., 105 F.2d 331, 333 (3d Cir. 1939)). Additionally, other district courts have interpreted Section 2(a) in a manner that requires two actual sales. South End Oil Co. v. Texaco, Inc., 237 F. Supp. 650, 652 (N.D. Ill. 1965) ("The question

10

of price discrimination does not arise until there are two actual sales at different prices to different purchasers. The prohibitions of [Section] 2(a) do not extend to mere offers."); Loren Specialty Manufacturing Co. v. Clark Manufacturing Co., 241 F. Supp. 493, 501 (N.D. Ill. 1965), aff'd, 360 F.2d 913 (7th Cir. 1966) ("There is no proof in the record that two contemporaneous sales were made at discriminatory prices; therefore, the [ ] requirements [of Section 2(a)] have not been met . . . ."); Century Hardware Corp. v. Acme United Corp., 467 F. Supp. 350, 357 (E.D. Wis. 1979) ("The Robinson-Patman Act prohibits two sales of the same product to different purchasers at different prices.").

Combining the language of Section 2(a) of the Robinson-Patman Act with the case law interpreting that language makes it clear that there is a two-sales requirement. That requirement is merely an extension of the core requirement that the party bringing a claim under Section 2(a) be a purchaser of goods at a discriminatory price. Plaintiff alleges that after receiving the altered terms regarding purchase of defendant's gold products, it *refused* to purchase gold products from defendant because it could not afford to purchase the gold products at the new price. Although plaintiff's allegations establish that plaintiff had been a purchaser under the old terms and prices, its allegations establish that it has not made any purchases at the new allegedly discriminatory prices, making plaintiff merely a prospective purchaser with respect to the new terms and prices. As a prospective purchaser, plaintiff cannot maintain a cause of action under Section 2(a) of the Robinson-Patman Act.

11

Finally, I note that plaintiff alleges that it is a "purchaser" under Section 2(a). However, as discussed above, this legal conclusion does not correspond to plaintiff's allegations of fact. Plaintiff's conclusory allegation cannot overcome contradictory facts specifically alleged. Therefore, I conclude that plaintiff has failed to state a claim for secondary-line price discrimination under Section 2(a) of the Robinson-Patman Act and plaintiff's first cause of action will be dismissed.

### C. Plaintiff's Fourth Cause of Action: Tortious Interference with Contract

Plaintiff contends that defendant is liable for tortious interference with contract because of its revocation and alteration of terms of the Lifetime Guarantee and Stock Balance program, which has interfered with plaintiff's current and prospective contracts with its customers now that plaintiff can no longer fulfill its contractual obligations to customers concerning defendant's Lifetime Guarantee and Stock Balance program. Defendant argues that plaintiff's tortious interference with contract claim must be dismissed because, under Wisconsin's interpretation of the economic loss doctrine, the only remedy available to plaintiff is through its breach of contract claim, that is, plaintiff cannot seek recovery in tort for an economic loss arising from an alleged breach of the parties' contract.

The economic loss doctrine "bars tort recovery for economic loss suffered by commercial entities," State Farm Mutual Automobile Insurance Co. v. Ford Motor Co., 225

12

Wis. 2d 305, 311, 592 N.W.2d 201, 203 (1999), and requires sophisticated commercial parties to "pursue only their contractual remedies when asserting an economic loss claim." Digicorp, Inc. v. Ameritech Corp., 2003 WI 54, ¶ 34, 262 Wis. 2d 32, 662 N.W.2d 652. (The parties have assumed in their briefs that Wisconsin law applies, so I have done the same. FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 283 (7th Cir. 2002) (in absence of any discussion of choice of law issues by parties, court applies law of forum state).)

Application of the economic loss doctrine is generally based on three policies: 1) preservation of the distinction between tort law and contract law; 2) protection of commercial parties' freedom to allocate economic risk by contract; and 3) encouragement of the party in the best position to assess risk, the commercial buyer, to "assume, allocate or insure against that risk." Daanen & Janssen, Inc. v. Cedarapids, Inc., 216 Wis. 2d 395, 403, 573 N.W.2d 842, 846 (1998). The economic loss doctrine is "based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena." Id. at 404, 573 N.W.2d at 846.

Although neither the Wisconsin state courts nor the Court of Appeals for the Seventh Circuit has determined to what extent the economic loss doctrine acts as a bar to claims for tortious interference with a contract, this court has previously addressed the issue in Latino Food Marketers, LLC v. Ole Mexican Foods, Inc., No. 03-C-0190-C, 2004 WL 632869, at *15-16 (W.D. Wis. Mar. 29, 2004). In Latino Food, I reasoned that although the

13

Wisconsin courts have not addressed the issue expressly, it is likely that they would find that the economic loss doctrine bars claims for tortious interference with contracts unless the claims are "extraneous" to the contractual relationship between the parties, that is, unless the actions underlying the claim were not breaches of the contract between the parties. Id. There have been no changes in Wisconsin law on the economic loss doctrine to alter my reasoning in Latino Foods. If anything, since Latino Foods, Wisconsin law regarding the economic loss doctrine has confirmed my previous reasoning. See, e.g., Wickenhauser v. Lehtinen, 2007 WI 82, ¶39 , 302 Wis. 2d 41, 67, 734 N.W.2d 855, 868 (narrow exception to application of economic loss doctrine for fraud in the inducement tort where fraud is extraneous to, rather than interwoven with, the contract) (citing Kaloti Enterprises, Inc. v. Kellogg Sales Co., 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205 and Digicorp, 2003 WI 54, 262 Wis. 2d 32, 662 N.W.2d 652).

Plaintiff's claim for tortious interference with contracts is clearly not "extraneous" to the contractual relationship between plaintiff and defendant. The foundation of plaintiff's tort claim is the alleged contract between plaintiff and defendant regarding the Lifetime Guarantee on defendant's gold products. What plaintiff is essentially asserting in its tort claim is that it has suffered damage as a result of defendant's failure to honor the warranty over the gold products defendant has sold to plaintiff. It would "drown contract law in a sea of tort" to allow plaintiff to proceed with its tortious interference with contract claim, which

14

arises from defendant's alleged contract or warranty breach. Daanen, 216 Wis. 2d at 410, 573 N.W.2d at 849 (internal quotes omitted). Because "[t]he whole purpose of the economic loss doctrine is to take the choice of a tort remedy away from the party and limit it to what is provided under contract law," plaintiff's claim for tortious interference with contract will be dismissed for failure to state a claim upon which relief may be granted. Latino Food, 2004 WL 632869, at *9.

D. Plaintiff's Fifth and Sixth Causes of Action: Unjust Enrichment and Promissory Estoppel

Defendant argues that plaintiff's claims for unjust enrichment and promissory estoppel should be dismissed because they conflict with plaintiff's claim for breach of contract. Conversely, plaintiff argues that asserting a breach of contract claim does not prevent it from asserting claims for unjust enrichment and promissory estoppel because pleading such claims together is permitted by Federal Rule of Civil Procedure 8(e)(2) as alternative pleadings.

As plaintiff correctly points out, Fed. R. Civ. P. 8(e)(2) permits a party to plead alternative theories of relief under both legal and equitable grounds, even if the theories are inconsistent. Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 397 (7th Cir. 2003). Under the doctrine of pleading in the alternative, "a party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead for quasi-contractual relief

15

in the alternative. Once a valid contract is found to exist, quasi-contractual relief is no longer available." Id. Plaintiff has done nothing more than plead alternative theories of relief by pleading its unjust enrichment and promissory estoppel claims along with a claim for breach of contract. Although plaintiff would not be able to recover under its quasi-contract claims if there was in fact a contract governing its relationship with defendant, it is free to plead such alternative theories at this stage of the litigation. Accordingly, plaintiff has pleaded its unjust enrichment and promissory estoppel claims as alternative theories of recovery under Rule 8(e)(2). Those claims will not be dismissed at this stage of the litigation.

ORDER

IT IS ORDERED that defendant Leslie's Jewelry Mfg. Corp.'s motion to dismiss plaintiff The Diamond Center, Inc.'s first, fourth, fifth and sixth causes of action for failure to state claims on which relief can be granted (dkt. #7) is:

    a. GRANTED with respect to plaintiff's first cause of action for secondary-line price discrimination under Section 2(a) of the Robinson-Patman Act and plaintiff's fourth cause of action for tortious interference with contract.

    b. DENIED with respect to plaintiff's fifth cause of action for unjust enrichment

16

and plaintiff's sixth cause of action for promissory estoppel.

Entered this 17th day of March, 2008.

        BY THE COURT:

         /s/

        _____
        BARBARA B. CRABB
        District Judge